| UNITED STATES DISTRICT COURT | **NOT FOR PUBLICATION** |
|---|---|
| EASTERN DISTRICT OF NEW YORK | |
| MENG MENG LIN, | **MEMORANDUM & ORDER** |
|          Plaintiff, | |
| – against – | |
| CITY OF NEW YORK, COMMISSIONER WILLIAM BRATTON, New York City Police Department, FORMER DEPUTY INSPECTOR RONALD LEYSON, New York City Police Department, 110th Precinct, PO BRIAN LEGUERNIC, New York City Police Department, 110th Precinct, PO SURRIGA, New York City Police Department, 110th Precinct, PO JOHN DOE, New York City Police Department, 110th Precinct, "JOHN DOE" being a fictious name, the true name is not known at this time, | 16-cv-2270 (ERK) (PK) |
|          Defendants. | |

Korman, *J*.:

      Meng Meng Lin sued the City of New York, NYPD Commissioner William Bratton, and four NYPD officers under federal and New York state law for civil-rights violations arising out of his arrest on September 24, 2013. Lin alleges he was beaten by three NYPD officers as he was leaving a card game in Elmhurst Park, Queens, and that the officers continued beating Lin after handcuffing him and placing him under arrest. Lin further claims that while he was in a holding cell at the 110th Precinct, he continuously, painfully cried for help and was ignored for nearly six hours, when he eventually was transported to Elmhurst Hospital. Lin, who does not speak English, also alleges that he was denied access to language services in violation of his rights under the Petition Clause of the First Amendment. Defendants move for summary judgment on all of Lin's causes of action.

1

**BACKGROUND**

On the evening of September 24, 2013, Meng Meng Lin was playing cards with friends in Elmhurst Park in Queens. Verified Complaint ¶ 14. As he left to return home, he noticed Defendant-Officers Leguernic, Surrgia, and Doe (later identified as Officer Michael Johnston, Deposition of Michael Johnston 11:2–18, Defs.' Ex. G, Dkt. No. 58-7, who is not a party to this action) approach, but Lin, who does not speak English, did not understand if the officers were issuing orders to him or directing him in any way. Compl. ¶¶ 16–17. Lin alleged that as he slowly walked away from the approaching officers, he was grabbed by the arm, pushed down to a park bench, and punched in the face by one of the officers. *Id.* ¶ 19. He was then punched and beaten on both sides of his body, and while he attempted to shield himself, he was kicked in the chest. *Id.* ¶¶ 20–21. While the officers handcuffed Lin, they continued to beat him, and Lin fell onto a bench and injured his knee. *Id.* ¶ 23. Lin, who was unarmed and claims to have never resisted arrest, was in too much pain to walk by himself to the patrol car. *Id.* ¶¶ 24–26. The officers dragged him in. *Id.* ¶ 26. Lin alleges that throughout this ordeal, he was beaten "continuously" by the officers for twenty minutes. *Id.* ¶ 27.

Lin was placed in a holding cell in the 110th Precinct, where he claims to have cried in pain and pleaded for help for hours to no avail. *Id.* ¶ 28–29. Officer Leguernic sought translation assistance from two officers, and eventually obtained contact information for Lin's niece, who reported to Officer Leguernic that Lin was crying because he had never been arrested before, Defs.' Stmt. Undisputed Facts Pursuant to Local Civ. R. 56.1 ¶¶ 37–39 ("Defs.' 56.1"), but she did not tell her Leguernic that Lin was hurt, Dep. of Brian Leguernic—Defs.' Excerpts 66:10-14, Defs.' Ex. E, Dkt. No. 58-5 ("Leguernic Dep.—Def."). Lin continued to cry, but did not report his injuries. Defs.' 56.1 ¶ 41. Though officers did not believe Lin to be crying in pain, *see id.* ¶

42, Officer Leguernic checked on Lin after seeing him clutch his stomach, but did not see any injuries. *Id.* ¶ 45. Lin fell asleep in his cell around 9:30pm, and was taken to Elmhurst Hospital around 3am. *Id.* ¶ 46–48.

When Lin arrived at the hospital, x-rays were taken, and he received pain medication for bruises on his torso. Compl. ¶ 30. Lin told a hospital interpreter that he had sustained injuries to the left side of his chest from a trip and fall the previous morning but did not have difficulty breathing. Defs.' 56.1 ¶ 50. But during his deposition, Lin denied making such a report. *Id.* ¶ 52. Lin's medical records also indicated that he later reported having been thrown to the ground on his left side by officers during an arrest and was in severe pain and struggled to breathe. Defs.' 56.1 ¶ 51; Lin's Medical Records—Pl's Excerpts 8, Pl.'s Ex. F, Dkt. No. 62-6 ("Lin Records—Pl."). Though there was no indication that Lin suffered a broken rib, Defs.' 56.1 ¶¶ 57, 60, Lin's records indicated chest tenderness, bruising,[1] and abdominal pain, *id.* ¶ 57, Lin's Medical Records—Defs.' Excerpts DEF 231, Defs.' Ex. H, Dkt. No. 58-8 ("Lin Records—DEF[#]"), and a CT scan indicated a possible malignancy in his right lung, Defs.' 56.1 ¶ 59. Lin was prescribed medication upon being discharged. Compl. ¶ 31. Though Lin could not afford follow-up care as prescribed, *id.* ¶ 32, he did seek treatment from a traditional Chinese medical practitioner for his pain, Defs.' 56.1 ¶ 62. Lin alleges that he continues to suffer from complications due to these injuries, including continued painful breathing and chronic pain that has prevented him from keeping a steady job. Compl. ¶ 32.

After the incident, Lin filed a Notice of Claim ("NOC") on September 30, 2013. Defs.' 56.1 ¶ 63. Because his NOC failed to include required details of the incident, including date,

---

[1] Lin's records reported "ecchymosis" on his left chest. Lin Record—DEF231. Ecchymosis is defined as "[a] purplish patch caused by extravasation of blood into the skin"—in other words, bruising. PDR MEDICAL DICTIONARY 539 (1st ed. 1995). Unless quoting from the medical record directly, I will refer to this as bruising.

3

time, location, or injuries suffered as a result, his claim was denied four days later. *Id.* ¶¶ 63, 64. In November 2013, Lin made a statement to the Civilian Complaint Review Board, alleging that Officers Leguernic and Surriga had beaten him on his left and right sides, respectively, and punched him in the face with a closed fist during his arrest. *Id.* ¶¶ 65–66. Lin filed his complaint on May 6, 2016, and defendants moved for summary judgment on all claims.

**DISCUSSION**

I. *The Summary Judgment Standard*

Summary judgment is required when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), but a "genuine" dispute does exist "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "In deciding whether there is a genuine issue of material fact as to an element essential to a party's case, the court must 'examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party.'" *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002) (quoting *Frito Lay, Inc. v. LTV Steel Co.*, 10 F.3d 944, 957 (2d Cir. 1993)). A district court's task at summary judgment "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010)).

Local civil rules in this district require that a party moving for summary judgment submit a statement of undisputed facts. Local Civ. R. 56.1(a). The party opposing the motion "shall

include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party." *Id.* 56.1(b). Parties are warned clearly that, "unless specifically controverted by a correspondingly numbered paragraph" in the nonmoving party's opposing statement, each "paragraph in the statement of material facts . . . will be deemed to be admitted." *Id.* 56.1(c).

Lin did not comply. Though he submitted an opposing statement, each numbered paragraph did not specifically controvert those in the defendants' statement, but rather, simply re-alleged his complaint verbatim. However, Lin did submit exhibits with his opposition to defendants' motion, and his complaint was verified. *See Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit for summary judgment purposes[.]"). It is within this Court's discretion to "determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). Though "[t]he purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties," I will rely on the exhibits submitted by the parties to substantiate Lin's opposition and conduct my own "assiduous review of the record." *Id.* (quoting *Monahan v. N.Y.C. Dep't of Corrections*, 214 F.3d 275, 292 (2d Cir. 2000)). Where a paragraph of the defendants' statement is uncontroverted by any evidence in the record, I will deem that statement admitted.

II. *Lin's Excessive Force Claim*

Officers' use of force during an arrest is excessive, and a violation of the Fourth Amendment, if it is "objectively unreasonable in light of the facts and circumstances confronting

5

[the officers], without regard to . . . underlying intent or motivation." *Nimely v. City of New York*, 414 F.3d 381, 390 (2d Cir. 2005) (quoting *Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004). Some amount of force is necessary to effect an arrest, and "[n]ot every push or shove" constitutes excessive force. *Graham v. Connor*, 490 U.S. 386, 396 (1989) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). Excessive force claims fail where injuries are de minimis. *Lemmo v. McKoy*, No. 08-CV4264, 2011 WL 843974, at *5 (E.D.N.Y. Mar. 8, 2011). Brief pain and minor discomfort do not qualify, *see id.* (citing cases), but even temporary, nonsevere injuries can be enough to meet the standard, particularly where "the apparent gratuitousness of the police conduct" caused the injury, *id*; *see Robison v. Via*, 821 F.2d 913, 923–24 (2d Cir. 1987) (excessive force claims survived summary judgment where officers had thrown plaintiff against a car and twisted her arms, causing her to suffer bruising for a couple of weeks post-arrest); *see also Jackson v. City of New York*, 939 F. Supp. 2d 235, 254 (E.D.N.Y. 2013) (summary judgment denied where medical records showed plaintiff was treated for bruising and tenderness and directed to take Tylenol); *Hodge v. Village of Southampton*, 838 F. Supp. 2d 67, 77–78 (E.D.N.Y. 2012) (denying summary judgment where plaintiff was only given ice and Motrin at the hospital after officer had slammed a door on plaintiff's prosthetic leg, and plaintiff suffered pain for several days after the incident); *Lemmo*, 2011 WL 843974, at *2, 7 (summary judgment denied where officers had cranked plaintiff's thumbs, even though, "[t]o be sure, his injuries [were] not severe."); *Davenport v. County of Suffolk*, 99-cv-3088, 2007 WL 608125, at *10 (E.D.N.Y. Feb. 23, 2007) (summary judgment denied where plaintiff alleged officers had banged his head on the patrol car during his arrest, even though plaintiff presented "no medical evidence of injury").

Defendants argue that Lin's injuries were limited to "[bruising] on his left side," and that his records showed "no rib injury." Defs.' Mot. Summ. J. 14 ("Mot."). But this is not the full picture. Lin testified that he was beaten against a chair or seat (also described as a bench, Dep. of Meng Meng Lin—Defs.' Excerpts 61:3–5, Defs.' Ex. B, Dkt. No. 58-2 ("Lin Dep.—Def.")), "pressed down" with his arms behind his back, while the officers were attempting to handcuff him. *Id.* 59:11–21. He claimed that he was beaten "all over my body," *id.* 61:19, while he was face-down, Dep. of Meng Meng Lin—Pl.'s Excerpts 63:5, Pl.'s Ex. B, Dkt. No. 62-2 ("Lin Dep.—Pl."). Lin alleged that "[i]t got so painful and swollen." *Id.* 63:6–7. He described having been beaten on his leg, arm, and torso, and sustaining the most severe beating to his left rib. Lin Dep.—Def. 64:8–16. He also testified that the beating stopped because he "kept on screaming, so painful." *Id.* 65:19. He reported having "almost lost consciousness." *Id.* 66:23–24. He reported that he was dizzy after the beating, *id.* 73:2–3, and still experiences dizziness occasionally, Lin Dep.—Pl. 97:12–18. Lin also testified he could not work for two years after the incident because "[i]t was so painful. No way to continue." *Id.* 90:22–91:1.

Lin's emergency room intake record indicated tenderness and bruising along the left side of his chest and abdomen, Lin Records—DEF231, and he was diagnosed with a chest wall injury, abdominal tenderness, and abnormal lung scan,[2] *id.* at DEF243, 251. He reported "severe pain" on his left side while moving, and painful breathing, Lin Record—Pl. 8, and received morphine in the hospital, Lin Record—Pl. 6. Other parts of the medical record indicated "blunt trauma with severe tenderness to LUQ"[3] and "traumatic injury to left abdomen and chest with

---
[2] Presumably, the abnormality on Lin's lung scan was unrelated to his injuries, as a beating would not cause the "irregular nodule," Lin Record—Pl. 10, or "lung mass", Lin Record—Pl. 17, observed on his CT scan and x-ray. *See also* Lin Record—DEF251; Lin Record—Pl. 10–11. The defendants refer to this as a "possible pulmonary malignancy." Mot. 6. Though that language does not appear in Lin's medical records, one note in his record recommends a follow-up CT scan to "clarify possible nodule." Lin Record—Pl. 12.

[3] "LUQ" in medical shorthand refers to the left upper quadrant of the abdomen, just below the ribcage. Unless quoting directly from the record, I will refer to this as the left side of Lin's abdomen. *See* Sean Patrick Nordt, et al.,

7

severe tenderness." *Id.* 10. Though he did not suffer a broken rib, Lin Record—DEF243, he was prescribed Motrin and Percocet for pain, Lin Record—Pl. 10–11, and was told to return for a follow-up within a week, *id.* at 17. A reasonable jury could determine that Lin's bruising, tenderness, and a hospital discharge with a prescription for Motrin are evidence of injuries "sufficiently harmful to be actionable." *Jackson*, 939 F. Supp. 2d at 254.

Defendants also argue that Lin's allegations about his arrest "are so inconsistent that they are insufficient to raise a genuine issue of fact." Mot. 14; *see Jeffreys v. City of New York*, 426 F.3d 549, 554–55 (2d Cir. 2005) (affirming summary judgment where "the District Court found nothing in the record to support plaintiff's allegations other than plaintiff's own contradictory and incomplete testimony," and "determined that 'no reasonable person could believe'" the plaintiff) (quoting *Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 477 (S.D.N.Y. 2003)). Though district courts ought not "routinely engage in searching, skeptical analyses of parties' testimony in opposition to summary judgment[,] . . . in certain extraordinary cases, where 'the facts alleged are so contradictory that doubt is cast upon their plausibility, the court may pierce the veil of the complaint's factual allegations and dismiss the claim.'" *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 106 (2d Cir. 2011) (quoting *Jeffreys*, 426 F.3d at 555).

This is not such an extraordinary case. To be sure, there are inconsistencies in Lin's testimony. For example, defendants note that Lin told the CCRB that he was punched "with a closed fist on the left side of his face," and "in the right side of his ribcage with his fist." Defs.' 56.1 ¶ 66. But at his deposition, Lin did not testify to being punched in the face, denied suffering any injury to his right side, Lin Dep.—Def. 97:8–11, and instead claimed to have been beaten "all over my body," *id.* 61:19, and alternatively, "on my left side," *id.* 62:10. Lin's verified

---

*Left Upper Quadrant Abdominal Pain*, 13(6) West J. Emerg. Med. 495–96 (2012), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3555578/.

complaint alleges that he was beaten for "continuously by the Defendants for about twenty minutes," Compl. ¶ 27, but at his deposition, Lin recounted that the beating lasted five minutes, Lin Dep.—Def. 59:1–13, 65:17–19, 66:12–15.

Lin's medical records also suggest a conflicting account of how he was injured in the first place: he told the hospital interpreter that he was injured after sustaining a fall walking earlier the previous morning, Lin Record—Pl. 5, but then reported that he was injured during a forceful fall to the ground during his arrest, *id.* 8. Neither of these notations describe a beating. Furthermore, at his deposition, Lin denied having ever told hospital staff about a trip-and-fall, Lin Dep.—Def. 109:23–110:11, and indeed denied having spoken to anyone at the hospital about the incident, *id.* 110:12–16. He also denied that he had any bruises from the incident, *id.* 97:19–98:4, but his medical records indicate that he did, Lin Record—DEF231. And though Lin testified to being unable to work for two years since the incident, Lin Dep.—Pl. 90:23–91:6, he also described having obtained temporary painting jobs during this period at which he would work for seven to eight hours a day, Lin Dep.—Def. 93:4–9.

Lin's story certainly contains inconsistencies, but none of them so damning as to be considered "sham evidence." *Rojas*, 660 F.3d at 104. The changes in Lin's story do not undermine his primary allegation—that the officers used excessive force in effecting his arrest— nor does his deposition contradict this. *Rojas* and *Jeffreys* both concerned "rare circumstances" in which it was "impossible for [the] district court to determine whether 'the jury could reasonably find for the plaintiff'…without making some assessment of the plaintiff's account." *Id.* at 105 (quoting *Jeffreys*, 426 F.3d at 554). While it is true that Lin is relying overwhelmingly on his verified complaint and deposition, *see id.*, the inconsistencies therein do not undermine the thrust of this claim, which is consistent with injuries established by portions of the medical

9

record. Moreover, the inconsistencies can be plausibly explained by confusion, *see, e.g.*, Lin Dep.—Def. 34:1–11, mistranslation, *see, e.g.*, *id.* 97:22–23, or simply the fact that Lin might not have been able to recount exactly which officer hit him on which part of his body at which point during his arrest, *see, e.g.*, *id.* 62:8–18, Lin Dep.—Pl. 63:5–17. These inconsistencies are not of the sort which would require a reasonable jury to "undertake [a] suspension of disbelief . . . to give credit to the allegations made in [the] complaint," even if a jury believed, for example, that Lin was beaten for five minutes, and not for twenty. *Jeffreys*, 426 F.3d at 555 (quoting *Schmidt v. Tremmel*, 93-cv-8588, 1995 WL 6250, at *3 (S.D.N.Y. Jan. 6, 1995)). Instead, a jury would simply need to determine—as is the jury's function—what if any, of Lin's testimony to credit as true. *See Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). At this stage, viewing the facts in the light most favorable to Lin, a genuine issue of fact remains regarding whether the officers used excessive force.

### III. *Lin's Deliberate Indifference Claim*

An arrestee or pretrial detainee's claim of deliberate indifference to medical need is analyzed under the Due Process Clause of the Fourteenth Amendment. *See Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (addressing pretrial detainees' claims of deliberate indifference to conditions of confinement); *see also Boston v. Suffolk County*, 14-cv-5791, 2018 WL 344970 at *10 (E.D.N.Y. Jan. 9, 2018) (applying *Darnell* to claims of deliberate indifference to medical need by arrestee). A plaintiff must prove first that the medical need was "sufficiently serious" such that it is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Johnson v. Wright*, 412 F.3d 398, 403 (2d Cir. 2005) (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir.1996)). The plaintiff must then prove that the officer "acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the

10

risk that the condition posed . . . even though the [officer] knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35.

Defendants argue that Lin's injuries—"at most . . . bruised ribs"—are not sufficiently serious. Mot. 10. Lin's medical records show no sign of fracture, and even his complaints of extreme pain do not meet the standard required by the first prong. *Id.* 11. Defendants also claim that Lin did not complain to anyone about his injuries, and that when he appeared hurt, Officer Leguernic attempted to examine Lin and saw no injuries. *Id.* 12. Lin argues in opposition that his medical records, indicating "severe pain," support that his injury was sufficiently serious and that defendants "needlessly prolonged" Lin's suffering by delaying in transporting him to the hospital. Pl.'s Mem. Law Opp. Defs.' Mot. for Summ. J. 15 ("Opp.").

Nevertheless, even if Lin's injuries had been sufficient to warrant the need for medical treatment, he has failed to allege that anyone at the station house "recklessly failed to act" to respond to his needs. *Darnell*, 849 F.3d at 35. Lin reported screaming at the precinct, but never made a specific complaint to anyone. Lin Dep.—Def. 86:15–19. Even if he had, Officer Leguernic sought translation assistance from two different officers. Leguernic Dep.—Def. 46:21–47:14; 49:3–10; 50:11–14; 51:2–14. Though these officers realized that Lin did not speak Mandarin, they were nonetheless able to communicate with him enough to get his name, address, and date of birth, but did not report he had complained of pain, Leguernic Dep.—Def. 51:5–14. Eventually Officer Leguernic was able to contact Lin's niece, who spoke with Lin and then informed Leguernic that Lin was crying because he had never been arrested before. *Id.* 64:11–18. She did not tell Leguernic that Lin was injured. *Id.* 66:10–14.[4] After making these efforts to communicate with Lin and merely hearing from Lin's own family member that Lin was scared,

---

[4] Lin's niece did not submit any affidavit in opposition to the motion for summary judgment.

11

Officer Leguernic himself examined Lin when he noticed Lin clutching his stomach, and found him uninjured. Defs.' 56.1 ¶ 45. Indeed, Lin has not disputed the defendants' claim that Officer Leguernic went to examine Lin while he was clutching his stomach. Shortly after, Lin fell asleep, *id.* ¶ 46, further suggesting he was not in imminent danger, and was ultimately transported to a hospital several hours after his arrival at the precinct, *id.* ¶ 48. Far from suggesting reckless failure to act, the officers made efforts to communicate with Lin, relied on the assertions of Lin's own niece that he was unharmed, examined Lin when there was a potential cause for concern, and eventually transported him to the hospital only hours after he arrived at the precinct.

Nor did the defendants needlessly delay Lin's hospital transport, as Lin argues in opposition. Lin arrived at the precinct around 8:45pm, Defs.' 56.1 ¶ 36, and was transported to Elmhurst Hospital around 3:00am, *id.* ¶ 48. For at least part of this period, Lin was asleep without evidence of serious injury. *Id.* ¶ 46. At most, Lin experienced a delay of just under seven hours before he arrived at the hospital. This is not prolonged enough to show a constitutional deprivation. *See Thomas v. Nassau Cty. Correctional Ctr.*, 288 F. Supp. 2d 333, 339 (E.D.N.Y. 2003) (holding that treatment delay is not unconstitutional except in egregious cases, such as delaying treatment as "a form of punishment, ignor[ing] a life-threatening and fast-degenerating condition for three days, or delay[ing] major surgery for over two years") (quoting *Espinal v. Coughlin*, 98 Civ. 2579, 2002 WL 10450, at *3 (S.D.N.Y. Jan. 3, 2002)); *cf. Lloyd v. City of New York*, 246 F. Supp. 3d 704, 720 (S.D.N.Y. 2017) (even a delay of one full day in treating an arrestee's serious wounds from her post-breast cancer reconstructive surgery was not sufficient to establish deliberate indifference). The several-hours delay in this case does not meet the standard.

IV.    *Lin's Petition Clause Claim*

Lin also alleges violations of his Petition Clause right under the First Amendment on the ground that the defendants knew immediately that Lin did not speak English, and yet denied him access to any language services while he was in custody. Compl. ¶¶ 81–82. Defendants argue that Lin was never prevented from lodging a complaint against the defendants, Mot. 16, nor does Lin have a constitutional right to an interpreter during an arrest, *id.* 17. In opposition, Lin primarily reiterates the purpose of the Petition Clause, Opp. 22, and argues that he was "denied the right to petition the government for redress by City Defendants [sic] failure to provide him with an interpreter," *id.* 23, alleging again that he was denied language services, *id.*, and referring to the NYPD's "Language Access Plan," Pl.'s Ex. I, Dkt. No. 62-9, which explicitly provides that "it is the policy of the [NYPD] to take reasonable steps to provide timely and meaningful access for LEP persons to the services and benefits that the Department provides to the degree practicable," *id.* at 2.

Lin's argument fails. The First Amendment Petition Clause secures an individual's right to petition the government for redress of grievances. *See Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011). Surely, through his Notice of Claim, Defs.' Ex. K, Dkt. No. 58-11 ("Lin NOC"), his CCRB interview, Defs.' Ex. M, Dkt. No. 58-13, and this very lawsuit, Lin has exercised that right without impediment. As for Lin's argument that the NYPD has some affirmative duty, under the Petition Clause, to provide an interpreter during an arrest or detention, Lin cites no authority. Nor is there any.[5] Indeed, the Petition Clause is limited: "The

---

[5] The closest case recognizing a right similar to what Lin describes is *Augustin v. Sava*, 735 F.2d 32, 38 (2d Cir. 1984), where the Second Circuit found that an asylee's procedural rights were violated where the translation of his asylum application was "nonsensical [and] the accuracy and scope of the [immigration] hearing translation are subject to grave doubt." But that holding was based on the petitioner's rights under the INS statute and its regulations, not under the First Amendment's Petition Clause. *Id.*

right to petition in general guarantees *only* that individuals have a right to communicate directly to government officials, and that individuals have the right of access to the courts to redress constitutional violations." *Kittay v. Giuliani*, 112 F. Supp. 2d 342, 354 (S.D.N.Y. 2000) (emphasis added). There is no case expanding "the right to communicate directly to government officials" to include an affirmative duty to provide interpretation services immediately upon arrest or detention under the First Amendment. Nor is there any other source for such federal right under § 1983. *Arum v. Miller*, 331 F. Supp. 2d 99, 111–12 (E.D.N.Y. 2004).

Even if such a right exists, which it does not, it is hard to fathom what more Officer Leguernic reasonably could have done to provide language services to Lin. It appears that he followed the policy as outlined in the very NYPD Language Access Plan that Lin cites in opposition. Officer Leguernic called two different officers who might have been able to translate, Leguernic Dep.—Def. 46:21–47:14; 49:3–10; 50:11–14; 51:2–14, learned that Lin spoke a dialect other than Mandarin (later revealed to be Fujianese, *id.* 56:8–9), *id.* 51:2–14, and spoke directly with Lin's niece to determine why Lin was crying, Defs.' 56.1 ¶¶ 39–40. Even knowing he could not communicate explicitly with Lin, Officer Leguernic attempted to help Lin when he thought he was injured by gesturing to him to lift up his shirt to examine him. *Id.* ¶ 45. While the defendants had no affirmative duty under the First Amendment as Lin argues, Officer Leguernic's actions fell well within the expectations set by the Language Access Plan.

V. *Personal Involvement by Commissioner Bratton, Deputy Inspector Leyson, and Officer Surriga*

Defendants seek to dismiss Lin's claims against NYPD Commissioner William Bratton, former Deputy Inspector Ronald Leyson of the 110th Precinct, and Officer Surriga, who have all been sued in their individual and official capacities, Compl. ¶¶ 9–10, 12, on the ground that Lin

has not shown personal involvement by any of these defendants in any of the events giving rise to his claims. Mot. 8.

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 886 (2d Cir. 1991)). Because there is no *respondeat superior* liability available under § 1983, Lin's allegations against Bratton, Leyson, and Surriga in their official capacities are only cognizable under Lin's *Monell* claim, *infra* Part VI. *See Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 690 (1978). A supervisor may be held liable in his or her individual capacity in a § 1983 action only if she or he was a "direct participant." *Terebesi v. Torreso*, 764 F.3d 217, 234 (2d Cir. 2014). This "includes a person who authorizes, orders, or helps others to do the unlawful acts, even if he or she does not commit the acts personally." *Id.* Direct participation "requires intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001).

Though Lin alleges that former NYPD Commissioner Bratton was, "[a]t all relevant times herein described," an "employee of the State of New York and was acting within the scope of employment in regard to the acts alleged," Compl. ¶ 9, and though the defendants inexplicably admitted in their Answer that Bratton was the NYPD Commissioner on the date of Lin's arrest, Defs.' Answer ¶ 9, Bratton was not even named NYPD Commissioner until December 2013 by Mayor-elect DeBlasio, whose term of office began in January 2014.[6] Therefore, it is impossible for Bratton to have been personally involved.

---

[6] J. David Goodman, *Bratton to Lead New York Police for Second Time*, THE NEW YORK TIMES (Dec. 5, 2013), https://www.nytimes.com/2013/12/06/nyregion/william-bratton-new-york-city-police-commissioner.html; J. David Goodman, *Bratton Takes Helm of Police Force He Pledged to Change*, THE NEW YORK TIMES (Jan. 2, 2014), https://www.nytimes.com/2014/01/03/nyregion/bratton-stands-before-police-force-with-a-mandate-for-change.html.

Even if Bratton had been the NYPD Commissioner on September 24, 2013, which he certainly was not, Lin has alleged no intentional participation by Bratton or then-Commissioner Raymond Kelly. Similarly, Lin has alleged no intentional participation or knowledge on the part of Deputy Inspector Ronald Leyson, who was employed as the commanding officer of the 110th Precinct on the date of Lin's arrest. Ans. ¶ 10. Though Lin introduced testimony from Officer Leguernic's deposition that a supervisor would have to sign the medical treatment form, Dep. of Brian Leguernic—Pl.'s Excerpts 103:16–104:9, Pl.'s Ex. C, Dkt. No. 62-3 ("Leguernic Dep.— Pl."), Lin has never alleged that Leyson would have been the supervisor responsible for signing this form. Nor has Lin alleged any facts that Leyson was an intentional participant in Lin's arrest, alleged beating, detention at the 110th Precinct, or transport to Elmhurst Hospital.

Defendants argue that Lin's allegations against Officer Surriga are limited to how the officer grabbed Lin during the arrest on his right shoulder. Mot. 9. However, Lin's complaint alleges that "either one of Defendants Leguernic or Surriga suddenly grabbed his arm, pushed him down on a park bench, and punched him in the face." Compl. ¶ 19. At Lin's deposition, he could not identify which of two officers, Lin Dep.—Def. 53:17–22, was forcing him down or beating him, *id.* 56:1–9, 59:1–13, and said that officers were beating him while trying to handcuff him, *id.* 59:19–24.

This does not preclude a finding of personal involvement. These allegations provide sufficient support to infer that Officer Surriga might have assisted in the "the unlawful acts, even if he or she [did] not commit the acts personally." *Terebesi v. Torreso*, 764 F.3d at 234.

VI. *Monell* Liability

Lin also alleges *Monell* claims for municipal liability on the grounds that it was "the policy and/or custom of [defendants] to inadequately and improperly investigate . . . and acts of

16

misconduct were instead tolerated by [defendants]." Compl. ¶ 35. Defendants argue that there is no *respondeat superior* liability under § 1983, that Lin has failed to show any individual liability by any of the supervisory defendants, and that Lin's *Monell* claim is "entirely conclusory and unsupported by anything in the record." Mot. 18.

Section § 1983 does not recognize municipal liability under a theory of *respondeat superior*. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978). A city can only be found liable where a plaintiff proves "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (quoting *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)). These allegations must plead specific facts that permit a jury to infer that a policy or practice caused the plaintiff's specific injury. *Selvaggio v. Patterson*, 93 F. Supp. 3d 54, 77–78 (E.D.N.Y. 2015). Mere conclusory allegations do not suffice, nor does a "simple recitation" that there was a failure to train officers. *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993), *overruled on other grounds by Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993).

Lin's allegations are entirely conclusory. One paragraph in his complaint alleges that the total amount paid for claims against the NYPD has increased in the past several years, Compl. ¶ 34, and the next paragraph asserts that this therefore "demonstrates that it was the policy and/or custom" of the defendants to ignore and tolerate police misconduct, *id.* ¶ 35. The complaint later alleges, through simple recitation, that the City, Defendant Bratton, and Defendant Leyson "failed to properly train officers within their supervision and control as to, *inter alia*, conducting an arrest." *Id.* ¶ 62. Nowhere does Lin allege that his specific injury was the result of a particular policy or custom with respect to the named defendant-officers. Lin's "conclusory allegations

17

cannot even survive a motion to dismiss, let alone summary judgment." *Selvaggio*, 93 F. Supp. 3d at 78.

VII.    *Lin's Pendent State Law Claims*

Lin also alleges pendent state-law causes of action including assault, battery, intentional infliction of emotional distress, and negligent infliction of emotional distress. New York General Municipal Law § 50-e(1)(a) provides that a plaintiff must file a notice of claim ("NOC") "as a condition precedent" to pursuing state-law claims "against a public corporation . . . or any officer, appointee or employee thereof." The NOC must be a sworn written statement, and must explain, *inter alia*, "the nature of the claim; . . . the time when, the place where, and the manner in which the claim arose; . . . and the items of damage or injuries claimed to have been sustained so far as then practicable." N.Y. Gen. Mun. Law § 50-e(2). Plaintiffs are also required to allege in a subsequent legal proceeding that they have complied with the NOC requirements, that at least thirty days have passed since the NOC was served, and that such action must be "commenced within one year and ninety days" after the incident giving rise to the proceedings. *See* N.Y. Gen. Mun. Law § 50-i(1). Merely filing the NOC is not enough, as the entire point of the NOC requirements is give the city an "adequate opportunity to investigate the claim in a timely and efficient manner," *Hardy v. N.Y.C. Health & Hosp. Corp.*, 164 F.3d 789, 793–94 (2d Cir. 1999) (quoting *Fincher v. County of Westchester*, 979 F. Supp. 989, 1002 (S.D.N.Y. 1997), which is impossible if the NOC fails to provide any detail whatsoever. This is why, "under New York law, if § 50-e has not been satisfied . . . no damages are available." *Id.* These requirements are strictly construed, and "[f]ailure to comply . . . ordinarily requires a dismissal for failure to state a cause of action." *Hardy*, 164 F.3d at 793–94. This applies to all of Lin's state-law claims.

Lin did not comply with these requirements, even though he was represented by counsel. While he did file an NOC just two days after his arrest, on Sept. 26, 2013, *see* Lin NOC 1, it failed to comply with the requirements outlined in the General Municipal Law, and was disallowed, *see* Disallowance Notice, Defs.' Ex. L, Dkt. No. 58-12. The disallowance notified Lin that he had failed to provide either the date, location, or description of the incident. *Id.* Indeed, Lin's NOC provided *none* of these details: no date or location, and only a simple allegation of "[v]iolation of multiple state and federal civil rights including but not limited to: Fourth, Fifth, Eighth, and Fourteenth Amendments." Lin NOC 1.

Even if Lin had properly complied with the NOC requirements, his claims for assault, battery, intentional infliction of emotional distress, and negligent infliction of emotional distress are time-barred. When an individual brings tort claims against the city, or against any employee indemnified by the city, the statute of limitations is one year and 90 days. *Rentas v. Ruffin*, 816 F.3d 214, 226 (2d Cir. 2016). Lin's arrest was on September 24, 2013. He therefore had until December 15, 2014 to bring these claims. He did not file this lawsuit until May 6, 2016, nearly a year and a half late.

## CONCLUSION

The defendant's motion for summary judgment is denied as to Lin's claim for excessive force under § 1983, denied as to Lin's claim of personal involvement against Officer Surriga, and granted as to all of Lin's remaining federal and state-law claims.

**SO ORDERED.**

Brooklyn, New York
August 29, 2018

*Edward R. Korman*
Edward R. Korman
United States District Judge